DONALD G. RAPE, CAROLINE C. RAPE AND LARRY A. RAPE v. WOODROW W. LYERLY AND WIFE, SUDIE D. LYERLY, KATHERINE L. MACK AND HUSBAND, PHILIP MACK AND A. GRAY LYERLY

No. 7419SC639

(Filed 16 October 1974)

1. Frauds, Statute of §§ 2, 7; Wills § 2— contract to devise property — sufficiency of revoked will as memorandum

A revoked will executed by the testator in 1959 and placed with the father of plaintiffs for safekeeping provided a sufficient memorandum of the agreement between testator and plaintiffs' mother to comply with the Statute of Frauds where the will included a promise by testator to leave the mother all of his property in return for the mother's obligation to care for testator and his wife and to pay certain sums to his other children.

2. Wills § 2; Specific Performance— contract to devise property — substituted parties — specific performance proper

In an action for specific performance of an alleged contract to devise real estate, evidence was sufficient to show that testator, by accepting the services of the father and the plaintiff children in the place of the mother, effectively substituted them in the original contract to the end that they are now entitled to specific performance of that contract where such evidence tended to show that the father, children and testator continued to live together after the death of the mother, the father and children took care of testator's every need, and testator expressed his satisfaction to others with respect to the treatment he received from the father and children.

3. Contracts § 2— substitution of parties — objection within reasonable time

Parties can be substituted in a personal contract when the parties do not object and they fully acquiesce in accepting the services

performed by the substituted party; if a party does object to substituted performance he must rescind within a reasonable time so as not to injure the substituted party.

Judge HEDRICK dissents.

APPEAL by defendants from *Crissman, Judge,* 28 January 1974 Civil Session of Superior Court held in ROWAN County.

Plaintiffs instituted this action on 5 May 1972 seeking specific performance of an alleged contract to convey real estate. In their complaint they allege: In March of 1959, James Richard Lyerly (Jim) entered into an agreement with his daughter, Mildred Lyerly Rape (Mildred), and his son, defendant Woodrow W. Lyerly (Woodrow), under which Mildred and Woodrow obligated themselves to care for Jim and his wife (Pearl) during their lifetime. In return, Jim agreed to leave all of his real estate to Mildred upon condition that she pay Woodrow $6,000, defendant A. Gray Lyerly $1,000, and defendant Katherine L. Mack $1,000. A writing embodying the agreement was signed by Jim on 21 March 1959. Mildred died in 1965 and thereafter her obligation to care for Jim and Pearl was performed by her husband, Basil Rape (Basil), and her three children, the plaintiffs. Pearl died in 1966 and Jim died on 23 November 1970. Jim left a will devising substantial parts of his real estate to defendants, contrary to his agreement with Mildred. Plaintiffs have demanded that defendants convey the real estate to them and have offered to pay defendants the amounts agreed upon by Jim and Mildred. Defendants have refused to convey the land.

Defendants filed motions to dismiss and for summary judgment, which motions were denied. At trial plaintiffs offered evidence summarized in pertinent part as follows:

Basil married Mildred in 1943, entered the armed forces and returned from World War II in 1945. Upon his return, Basil and Mildred moved in with Jim and Pearl. Their first son, Larry, was born 20 November 1945. In the spring of 1946, Basil, Jim and Woodrow began farming together with Basil operating a dairy. Between 1946 and 1959, Basil and Mildred had two more children, Donald, born in 1949, and Caroline, born in October 1950. By 1959 Basil and Mildred decided to move out of Jim's house and build a home of their own.

When Jim discovered that Basil and Mildred were planning to move out, he asked them to stay and take care of him and

Pearl; in return he would let them remodel the house and would leave his real estate to them upon his death.

Thereafter, on 21 March 1959, Jim executed a will containing the following provision:

"Fourth: It is my opinion that $16,000.00 is a fair market value of my real property lying in Steele Township, Rowan County, N. C. Since my daughter, Mildred Lyerly Rape and my son, Woodrow W. Lyerly have obligated themselves to care for my wife and my self during our lifetime, all of my real property, I give and bequeath to Mildred Lyerly Rape upon payment by her to the following: 1st. To my son, Woodrow W. Lyerly, the sum of $6,000.00 2nd. To my son, Gray Lyerly the sum of $1,000.00 3rd. To my daughter, Katherine Lyerly Mack the sum of $1,000.00."

Jim named Basil and Woodrow executors and delivered the will to Basil for safekeeping. Basil placed the will in his safe deposit box where it remained until after Jim's death.

Thereafter, Mildred, Basil and their children lived with and cared for Jim and Pearl. Pearl was a very sickly woman and extremely temperamental, requiring a lot of attention and care. Jim was quite healthy until he had a heart attack in 1961. After that he did little work but continued to be very active in the community. Basil made many improvements to the homeplace and to the farm between 1959 and Jim's death in 1970. The homeplace was remodeled in 1959 and 1960, costing approximately $6,000.00, which Basil paid.

In 1961, it was discovered that Mildred had breast cancer. Surgery was performed from which she recovered quickly. She continued to carry on the household functions, including cooking and caring for Jim and Pearl. Jim stated many times to different witnesses that he was well cared for by Basil, Mildred and the children before and after Mildred's surgery.

Following Jim's heart attack, Woodrow and Basil entered into a formal partnership agreement to farm together. The agreement contained a buy-sell provision by which one partner, upon proper notice, could either buy or sell his interest to the other partner.

After Mildred's surgery, she began teaching Caroline how to run a household. The other Rape children helped their father with the farming and attending to the needs of Jim and Pearl.

Jim constantly bragged about the excellent treatment he received from the Rape children and how they cared for his every need.

Mildred died of cancer in 1965. After her death, in response to a question as to what Basil was going to do, Jim responded: "Oh, he can't leave. We have got an agreement. He's got to stay with us," and on another occasion, " . . . They will have to live here—live with us and take care of mama and me. We have papers drawn up to that effect." With respect to the treatment he and Pearl received after Mildred's death, Jim stated to a witness:

> "He said that the Rape family waited on him and Miss Pearl just like they were children. That anything they wanted, they got. That the Rape family was very good to them. A lot of times when I would go over there, Basil would be cooking dinner and getting dinner ready or something like that or washing the dishes. He would just be busy all the time doing something. If he wasn't outside, he was inside waiting on them. I am talking about the time after Mildred died in 1965. From 1959, until Mildred's death, Basil was right there helping, but Mildred, she never did give up and she didn't go to bed. She waited on Miss Pearl and Mr. Jim and cooked for Basil and his family. After Mildred's death, Caroline took part. She was about thirteen or fourteen at her mother's death and she took right over doing the cooking, houseworking and waiting on Miss Pearl."

Many witnesses, including a brother, sister and nephew of Jim, and neighbors of both families, testified that Jim bragged to them up until his death of the excellent treatment that he was receiving. He never complained to anyone about his treatment.

Pearl died in 1966. In 1969, Basil bought Woodrow's interest in the partnership. Donald went off to college, but continued to help on the farm. Caroline entered college in 1969, but came home almost every weekend and helped around the house.

On 4 September 1969, Jim executed another will in which he revoked all prior wills, devised a major portion of his real estate to defendants and a minor portion to plaintiffs, and named his daughter, defendant Katherine L. Mack, executrix. The will contained a provision to the effect that if any beneficiary under the will instituted any action to set aside or change the effect of the will, all benefits in favor of such beneficiary would be revoked.

The execution of the 1969 will was kept a secret, particularly as to Basil and plaintiffs, until after Jim's death on 23 November 1970 when the will was probated. Between 4 September 1969 and Jim's death, Basil made additional improvements to the farm including the construction of a trench silo. Basil and plaintiff Donald Rape continued to live on the farm and operate it after Jim's death.

Plaintiffs tendered the money stated in the agreement that Jim had with Mildred but the tender was refused by defendants. The money has been tendered to the court. Plaintiffs then brought this action seeking specific performance of the contract.

The following issues were submitted to the jury:

(1) Did James Richard Lyerly enter into a contract to leave his real property by will to Mildred Lyerly Rape in return for care of himself and his wife during their lifetime and upon the condition that Woodrow W. Lyerly be paid the sum of $6,000.00; Gray Lyerly the sum of $1,000.00 and Katherine Mack the sum of $1,000.00?

(2) Did Mildred Lyerly Rape perform, during her lifetime her obligations as contemplated by the contract?

(3) Following the death of Mildred Lyerly Rape and until the death of James Richard Lyerly and his wife, was care for James Richard Lyerly and his wife furnished by or on behalf of the plaintiffs as contemplated by the agreement, and did James Richard Lyerly accept such services in fulfillment of the said agreement?

(4) Was this action instituted by the plaintiffs in good faith?

The jury answered all issues "YES" and from judgment predicated on the verdict in favor of plaintiffs, defendants appealed.

*Kluttz and Hamlin, by Lewis P. Hamlin, Jr., and Richard R. Reamer, for the plaintiff appellee.*

*Collier, Harris, Homesley, Jones & Gaines, by Walter H. Jones, Jr., for the defendant appellants.*

BRITT, Judge.

Defendants contend the court erred in failing to grant their motions to dismiss the action, for summary judgment, and for

directed verdict. We will discuss some of the grounds argued by defendants in support of their motions.

At the outset, defendants argue that Basil is a necessary party to this action. While denying that he is a necessary party, plaintiffs have moved in this court that they be allowed to file a disclaimer of interest by Basil. We have allowed the motion and the disclaimer has been filed.

[1] The theory of plaintiffs' case is that their mother, Mildred, and Jim entered into a contract in 1959 whereby Mildred agreed to look after Jim and Pearl for the remainder of their lives and in return Jim agreed to convey by will certain real estate to Mildred. The first question that arises is whether the revoked will which Jim executed in 1959 and placed with Basil for safe-keeping provided a sufficient memorandum of the agreement to comply with the Statute of Frauds. We hold that it did.

The pertinent part of our Statute of Frauds, G.S. 22-2, provides that "(a)ll contracts to . . . convey any lands, tenements or hereditaments, or any interest in or concerning them, . . . shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith . . . . " Plaintiffs introduced the 1959 will of Jim as evidence of the written agreement between the parties. The provision of the will critical to this case is the fourth article quoted above.

Our research has failed to reveal a case in which a North Carolina appellate court has held that a revoked will is a sufficient memorandum to satisfy the Statute of Frauds. However, our Supreme Court has held that a *joint will* between a husband and wife was a sufficient memorandum of the contract for the disposition of their estates to satisfy the Statute of Frauds. *Mansour v. Rabil,* 277 N.C. 364, 177 S.E. 2d 849 (1970) ; *Olive v. Biggs,* 6 N.C. App. 265, 170 S.E. 2d 181 (1969), *cause remanded* 276 N.C. 445, 173 S.E. 2d 301 (1970) ; *but see Hicks v. Hicks,* 13 N.C. App. 347, 185 S.E. 2d 430 (1971) in which the Court of Appeals held that a joint will which had been subsequently revoked was not sufficient to satisfy the Statute of Frauds. Underlying these decisions is the principle that the revoked will must state or make clear reference to the agreement so that the duties and considerations of the contracting parties is known. If there is no contractual language in the will, then it is insufficient to satisfy the Statute of Frauds. *Hicks v. Hicks, supra.*

The Supreme Court was faced with the question in *McCraw v. Llewellyn*, 256 N.C. 213, 123 S.E. 2d 575, 94 A.L.R. 2d 914 (1962), but held that the revoked will in that case was insufficient for the following reasons (p. 217) :

> The writing must show the promise or obligation which the complaining party seeks to enforce. (Citations omitted.)

> "An aggrieved party may recover for the breach of a contract, made upon sufficient consideration, that the promisor will make him the beneficiary of a bequest or devise in his will, but such a contract must be established by the mode of proof legally permissibe in estabishing other contracts." (Citation omitted.)

> "THE AGREEMENT MUST ADEQUATELY EXPRESS THE INTENT AND OBLIGATION OF THE PARTIES. Parol evidence cannot be received to supply anything which is wanting in the writing to make it the agreement on which the parties rely." (Emphasis added.) (Citations omitted.)

*See* 1 *Page on Wills* sec. 10.12 (Bowe-Parker rev. 1960) ; J. Webster, *Real Estate Law in North Carolina* sec. 119 (1971) ; 57 Am. Jur. *Wills* sec. 187 (1948) ; 94 C.J.S. *Wills* sec. 111 (b) (1956) ; Annot., 94 A.L.R. 2d 921 (1964).

Therefore, in order for Jim's 1959 will to be sufficient it must "adequately express the intent and obligation of the parties." We think the will does that. Jim clearly states the parties' obligations. Jim promises to leave Mildred "all of my property" in return for Mildred obligating herself to take care of Jim and Pearl and also to pay certain sums to his other children. This leaves no question as to what the obligations of the parties were. We hold that the 1959 revoked will satisfies the memorandum requirement of the Statute of Frauds.

[2]   The next question that arises is whether Jim's legal obligation to devise the real estate terminated at the time of Mildred's death in 1965; or, whether Jim's failure to rescind within a reasonable time and his continuing to accept the services rendered by Basil and Mildred's children constituted full acquiescence on Jim's part, thereby making the children parties to the contract by substitution. We hold that the evidence was sufficient to support a jury finding that by Jim's acquiescence, the children became parties to the contract by substitution.

No case is cited and our research has disclosed no precedent in this jurisdiction that provides clear direction. The nearest case in point appears to be *Siler v. Gray,* 86 N.C. 566 (1882) : In *Siler,* the court held that the parents could not force the administrator of their deceased child's estate to care for them as the child had contracted to do because the agreement was a personal contract which died with the parties. However, the court held that the intention of the parties governs each case and there was no evidence in that case that the parties ever intended that there be a substitution of parties. In *Burch v. Bush,* 181 N.C. 125, 106 S.E. 489 (1921), Justice (later Chief Justice) Stacy stated that whether there is a personal contract depends upon the intention of the parties.

Our review of decisions from other jurisdictions discloses that the question has been answered favorably to plaintiffs in several cases. The case nearest in point is *Soper v. Galloway,* 129 Iowa 145, 105 N.W. 399 (1905), where the evidence tended to show : One C.V.A. entered into a contract with his sister, T.S., and her husband, G.W.S., whereby it was agreed that the sister and her husband would move onto and operate C.V.A.'s farm, and would board and care for C.V.A. during the remainder of his natural life; that at his death, and in consideration of such service, they would become the owners of the farm. The sister, her husband and two children (plaintiffs in the action for specific performance) moved onto the farm and otherwise proceeded to comply with the contract. Fourteen years later, the sister died and her husband and the children continued to care for C.V.A. The next year, the husband died, and the plaintiffs continued to care for C.V.A. who died two years later intestate. Plaintiffs claimed the farm as substituted parties to the original contract. The court at pages 147-8 states the following rule:

> "It is a contention of defendants, made in argument, that the contract, if made, was purely personal in character, and for that reason terminated at once upon the death of the parent of plaintiffs. There is no merit in this contention. We need not determine what the rights of the parties would have been had (C.V.A.) refused to accept a continuation of service at the hands of plaintiffs. He did accept such service, and in view thereof, and of the relation of the parties, we think it must be said that within the understanding of each, such substituted performance was in compliance with the contract requirements, and to be followed by the same measure of rights which, had their death not inter-

Rape v. Lyerly

vened, would have accrued to the parents of plaintiffs. This conclusion has support in the following cases. (Citations omitted.)"

In the case of *Prater v. Prater*, 94 S.C. 267, 77 S.E. 936 (1913), the court, faced with a similar situation, stated at page 280: "If M. A. Prater did not intend that the agreement should continue in force, it was his duty within a reasonable time after Drayton Prater died, to give her notice of such intention. From August, when he died, until January, when Mary R. Prater left, was certainly an unreasonable time for giving the notice to her."

[3] The rule to be gleaned from these two cases is: Parties can be substituted in a personal contract when (1) the parties do not object, and (2) fully acquiesce in accepting the services performed by the substituted party. If a party does object to substituted performance he must rescind within a reasonable time so as not to injure the substituted party. See also, 1 *Page on Wills* sec. 10.25 (Bowe-Parker rev. 1960); 57 Am. Jur. *Wills* sec. 175 (1948); 94 C.J.S. *Wills* sec. 117(d) (1956).

In the only case cited by defendants, *Bourget v. Monroe*, 58 Mich. 563, 25 N.W. 514 (1885), the facts are easily distinguishable from the facts in this case. In *Bourget*, the father immediately upon his daughter's death repudiated the contract and excluded the husband from the house.

[2] For the reasons stated, we hold that the evidence was sufficient to show that Jim, by accepting the services of Basil and the plaintiffs in the place of Mildred, effectively substituted them in the original contract to the end that they are now entitled to specific performance of that contract.

We have carefully considered the other contentions and assignments of error brought forward and argued in defendants' brief and find them to be without merit. We hold that the controversy was properly submitted to the jury on appropriate issues at a trial in which there was no prejudicial error.

No error.

Judge BALEY concurs.

Judge HEDRICK dissents.